**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Cordell NICHOLS also known**
**as Quinndell Johnson,**
**Defendant–Appellant.**

No. 03–3284.

United States Court of Appeals,
Tenth Circuit.

July 6, 2004.

Stephen W. Kessler, Topeka, KS, for Defendant–Appellant.

Eric F. Melgren, United States Attorney, Anthony W. Mattivi, Assistant Untied States Attorney, Topeka, KS, for Plaintiff–Appellee.

Before TACHA, Chief Judge, ANDERSON and BALDOCK, Circuit Judges.

ANDERSON, Circuit Judge.

Cordell Nichols was convicted, following a jury trial, of one count of possession with intent to distribute approximately 4.6 kilograms of heroin, in violation of 21 U.S.C. § 841(a)(1), and one count of conspiracy to distribute in excess of one kilogram of heroin, in violation of 21 U.S.C. § 846. He was sentenced to 360 months' imprisonment, followed by ten years of supervised release. On appeal, Nichols argues (1) evidence seized following two traffic stops should have been suppressed because the stops violated the Fourth Amendment; (2) testimony regarding a third traffic stop should have been held inadmissible under Fed.R.Evid. 404(b); (3) a DEA agent's testimony regarding allegedly threatening statements made by Nichols at the time of his arrest should also have been held inadmissible under Fed.R.Evid. 404(b); and (4) there was insufficient evidence to support Nichols' conspiracy conviction. For the reasons set forth below, we affirm.[1]

## BACKGROUND

Nichols was stopped by police on three separate occasions in three different states over a two-and-a-half year period, each time while traveling on the stretch of I–70/I–80 that runs between St. Louis, Missouri, and Sacramento, California. As discussed in further detail below, Nichols argues that testimony concerning the first of these stops is extrinsic evidence that should have been excluded from trial under Rule 404(b), and that the second and third stops were in violation of the Fourth Amendment. For clarity, we describe each of the stops here in chronological order.

### 1999—Wyoming Traffic Stop

The first traffic stop occurred on October 12, 1999, on westbound I–80 near Rawlins, Wyoming. Police officers presented the following testimony at trial: On that evening, Trooper William Morse of the Wyoming Highway Patrol observed a Mercury Cougar traveling only sixty mph in a seventy-five mph zone and weaving back and forth across the center line. He stopped the vehicle based on his suspicion that the driver, who turned out to be Nichols, was intoxicated or fatigued. Upon approaching the vehicle, Morse smelled

---

1. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R.App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

burnt marijuana. Nichols told Morse he was traveling to Sacramento and, responding to Trooper Morse's request for a driver's license and registration, produced a Missouri ID card bearing the name "Charles Rhodes." Morse immediately recognized the card was "obviously a cheap imitation." Tr. of Jury Trial at 53, R. Vol. 6. Meanwhile, Morse observed bits of a "green leafy substance" on Nichols' clothing and, based on his police training and experience, suspected the substance was marijuana that Nichols had tried to destroy by eating it. *Id.* at 55. Trooper Morse then asked Nichols to step out of the car and placed him under arrest. In a pat-down search, the officer discovered a large roll of cash, later determined to amount to $12,746, in Nichols' pocket. Though Nichols claimed to have won the money at the Casino Queen, a riverboat casino, further investigation conducted by Special Agent Robert Lezanby of the Wyoming Division of Criminal Investigation revealed the casino had no record of such a win. After Nichols gave consent to a search of his car, Agent Lezanby also discovered false compartments behind the vehicle's front seats with evidence of recent use, a receipt indicating the car had been recently vacuumed, and traces of marijuana on the floorboard of the car.

Pursuant to an agreement with the State of Wyoming, Nichols subsequently pled guilty to interference with lawful police duties, driving under suspension, and a lane violation. In exchange, the state dropped a charge of marijuana possession. Instead of going through forfeiture proceedings regarding the seized $12,756, the state agreed to return $7000 to Nichols, thus keeping $5,746.

## 2000—St. Louis Traffic Stop and Subsequent Apartment Search

The second traffic stop occurred on September 14, 2000, on westbound I–70 near St. Louis, Missouri. DEA agents and state police officers testified to the following facts at the suppression hearing and at trial: After receiving information from a confidential informant that Nichols and others, driving a green Land Rover, would be leaving that evening for California in order to pick up heroin, and would be carrying drugs and a large amount of money, DEA Special Agent David Turner enlisted the help of local police to watch for the vehicle.

At approximately 7:15 p.m., Detective William Verhaeghe, traveling with Lieutenant Hawkins, a uniformed officer in a marked police car, was informed by other detectives in unmarked surveillance cars that they had just observed the vehicle speeding and changing lanes without signaling. Verhaeghe then spotted the vehicle, identifying it based on its model and license plate number. He and Hawkins stopped the Land Rover. When they approached, they smelled raw marijuana. They immediately arrested all four people in the vehicle, including Nichols, who had been driving, and Tristin Mitchell, a passenger, who was sixteen years old at the time and was one of Nichols' codefendants at trial. When asked to identify himself, Mitchell said his name was "Tyrone Greene" and that he was from Los Angeles. Police later identified him as Mitchell from fingerprint evidence.

The officers determined that the vehicle had been leased by another of the passengers, Damon Campbell, and obtained Campbell's consent to search the vehicle after it was taken to the police department. During the search of the rear hatch area of the Land Rover, police found approximately twenty grams of marijuana, divided up into eight baggies, and, in a suitcase Nichols identified as his, $5,700 cash.

After learning Nichols had been staying in St. Louis with Sheneice Sanders, police went to her apartment and obtained her consent to search. The search revealed a small amount (less than five grams) of marijuana; approximately two ounces of black tar heroin; two .380 semiautomatic handguns, one of them in the same drawer as the heroin; ammunition; and $2,700 in currency. Police also found Dormin capsules, which can be used as a cutting agent for heroin; empty gel capsules of the type used to distribute heroin after it has been cut; and a coffee grinder, which police suspected of being used to process heroin. Nichols' fingerprint was found on the grinder. No charges were filed as an immediate result of this incident.

## 2002—Kansas Traffic Stop

The third traffic stop occurred on May 22, 2002, at approximately 7:15 a.m. on eastbound I–70 in Lincoln County, Kansas. Police testified to the following facts at the suppression hearing: Trooper Michael Weigel of the Kansas Highway Patrol observed a gold Buick following close behind an RV. Using a stopwatch, Weigel timed the distance between the Buick and the RV at less than two seconds, which he considered unsafe. He timed the distance twice more, with the same result. He then activated his police car lights and initiated a traffic stop. The vehicle had three occupants—Tristin Mitchell, who was driving; Nichols, who identified himself to Weigel as Quinndell Johnson; and Kristen White. Weigel first spoke to Mitchell, who said he did not have a driver's license and showed the officer a rental contract for the car. The contract indicated the car had been rented in Sacramento on May 15, 2002, for one day only, and was not supposed to be driven outside California. Angela McCauley, who was not in the Buick, was listed in the contract as the person who had rented the vehicle and as the only authorized driver. Mitchell told Weigel that McCauley was White's aunt, but she was later determined to be Nichols' aunt.

Weigel took Mitchell back to his police car and ran background checks on the vehicle occupants and on McCauley. He learned that Mitchell had a prior drug arrest and criminal record and that McCauley had a criminal record. He found no record of a driver's license under the name Quinndell Johnson but did verify that White had a valid driver's license. Weigel then issued a warning to Mitchell and returned his paperwork. Weigel then returned to the Buick to tell White that she would have to drive the vehicle since she was the only occupant with a valid license. He told her they were free to leave and then asked if he could talk to her further. When she agreed, Weigel asked if there were drugs, guns, or explosives in the vehicle. She said no. He then asked if he could look in the trunk of the vehicle. According to Weigel's testimony, she said, "Sure" and, with Weigel's assistance, opened the trunk. There, Weigel found a plastic bag containing several small bags of marijuana along with a number of bundles wrapped in black electric tape. He cut one of the bundles open and observed a dark substance that appeared to be black tar heroin. A total of approximately 4.6 kilograms of the substance, later determined to contain 17% heroin, was seized. As a result of this incident, Nichols, Mitchell, and White were indicted in federal court on counts of possession and conspiracy to distribute. Following the indictment Nichols was arrested by DEA Special Agent George Cazenavette. According to Cazenavette, while he was processing the arrest at the police station, Nichols made a threatening statement to him.

Before trial, Nichols filed two motions to suppress the evidence seized during the St. Louis and Kansas stops and the St.

Louis apartment search. He also filed a motion in limine seeking to exclude testimony about the Wyoming stop. The district court denied these motions. At trial, Nichols objected to Agent Cazenavette's testimony concerning Nichols' allegedly threatening statement. The district court overruled his objection. Nichols was convicted on both counts of the indictment. Mitchell was convicted on the possession charge only, and White was acquitted on both charges. Following sentencing, Nichols brought this appeal.

## DISCUSSION

We address each of Nichols' arguments, set forth above, in turn.[2]

### A. Denial of the Motions to Suppress

We first review the district court's denial of Nichols' motions to suppress evidence seized during the St. Louis and Kansas vehicle stops and St. Louis apartment search. In doing so, "we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review the ultimate determination of reasonableness under the Fourth Amendment de novo." *United States v. Marquez,* 337 F.3d 1203, 1207 (10th Cir.2003).

Nichols claims that both the St. Louis and the Kansas stops were unjustified at their outset and that the scope of the detention following each of these stops went beyond what was permissible under the circumstances. Applying the principles of *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), we consider an initial traffic stop reasonable " 'if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.' " *United States v. Callarman,* 273 F.3d 1284, 1286 (10th Cir.2001) (quoting *United States v. Botero–Ospina,* 71 F.3d 783, 787 (10th Cir.1995) (en banc)). In analyzing the permissible scope of the stop, we adhere to the rule that a vehicle "must be permitted to proceed after a routine traffic stop if a license and registration check reveal no reason to detain [it] unless the officer has reasonable articulable suspicion of other crimes or the driver voluntarily consents to further questioning." *United States v. West,* 219 F.3d 1171, 1176 (10th Cir.2000).

 In regard to the St. Louis stop, the district court found that prior to the stop, police had "observed two traffic violations—speeding and a lane change without using a turning signal." *United States v. Nichols,* 248 F.Supp.2d 1027, 1030 (D.Kan. 2003). This finding is not clearly erroneous. The stop was thus justified at its outset. The scope of this stop was then permissibly expanded when police smelled raw marijuana in the vehicle. The odor of marijuana, together with the information police had received from their confidential informant, provided probable cause to arrest the vehicle's occupants. *United States v. Romero,* 692 F.2d 699, 703 (10th Cir.1982). We hold the St. Louis stop was reasonable and thus any evidence discovered as a result of the stop was admissible against Nichols.[3]

---

**2.** Nichols has also brought before us a pro se motion for leave to file a supplemental brief. We have summarily reviewed the supplemental brief and conclude the issues raised either duplicate those raised by Nichols' attorney or are meritless. Further, since Nichols is represented by counsel, his motion is out of order and denied. *United States v. Guadalupe,* 979 F.2d 790, 795 (10th Cir.1992).

**3.** It is unclear from Nichols' brief whether he intends to challenge the searches of the car, his suitcase, or the St. Louis apartment on any basis other than that they resulted from an unreasonable traffic stop. In any case,

■ In regard to the Kansas stop, the district court credited Trooper Weigel's testimony that he observed the gold Buick following less than two seconds behind the RV in front of it. *Nichols*, 248 F.Supp.2d at 1031. Again, this finding is not clearly erroneous. We reject Nichols' argument that Trooper Weigel's use of a two-second "rule of thumb" to determine the Buick was following the vehicle in front of it too closely was improper. The Kansas statute in question states:

> The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.

Kan. Stat. Ann. § 8–1523(a). Weigel explained it was in accord with his training and common practice in his department to use the two-second rule to determine violations of this statute. The district court found his testimony "clear and credible" and concluded from it that "[t]he government ha[d] met its burden of showing . . . reasonable suspicion that a violation had occurred." *Nichols*, 248 F.Supp.2d at 1031. We believe Weigel's use of a two-second rule of thumb together with his calculation of the interval three separate times provided the "minimal level of objective justification" required for reasonable suspicion justifying a traffic stop. *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). The stop was thus justified at its outset. *See United States v. Vercher*, 358 F.3d 1257, 1262 (10th Cir.

2004) (reasonable suspicion of a section 8–1523 violation existed based on an officer's determination that the space between vehicles was not reasonable and prudent); *see also United States v. Lopez–Guzman*, 246 F.Supp.2d 1155, 1158 (D.Kan.2003) (referring to another Kansas officer's use of a two-second rule when applying section 8–1523).

■ Further, the scope of the Kansas stop was permissibly expanded when Trooper Weigel discovered Mitchell, the Buick's driver, had no driver's license. On that basis, he was justified, after giving Mitchell a warning and returning his papers, in approaching White—the only vehicle occupant with a driver's license—in order to tell her she would need to drive. Following that, White consented to further questioning,[4] so the stop became a consensual encounter, and the officer's question about drugs and weapons and his request to search the vehicle were permissible. Moreover, this questioning was also justified by reasonable suspicion based on the occupants' "having no proof of ownership of the vehicle [and] having no proof of authority to operate the vehicle," *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir.1998), together with Mitchell's and McCauley's criminal records, the unconfirmed identification of "Quinndell Johnson," and the occupants' apparent violation of the vehicle rental agreement.

We thus conclude the district court properly denied Nichols' motion to suppress the evidence seized in these stops.

---

even assuming Nichols has standing to challenge these searches, *see United States v. Eylicio–Montoya*, 18 F.3d 845, 851 (10th Cir. 1994), such a challenge would fail since, as Nichols appears to concede, both the car search and the apartment search resulted from a valid consent by the person with authority to give consent. *United States v. Abdenbi*, 361 F.3d 1282, 1288 (10th Cir.2004).

Moreover, we have held that the smell of raw marijuana provides probable cause to search a vehicle and luggage. *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir.1998).

4. Nichols concedes that Trooper Weigel "told [him] and those in the car that they were free to leave" before questioning White further. Appellant's Br. at 14.

It also properly denied suppression of the evidence seized from the St. Louis apartment, which, as indicated above, was searched with the consent of its tenant, Sheneice Sanders. Contrary to Nichols' claim, the police did not require probable cause, stemming from the traffic stop, to justify this search.

## B. Admission of Wyoming Stop Evidence

■ We turn next to Nichols' claim that the district court improperly admitted testimony concerning the Wyoming traffic stop and the marijuana and cash found in that vehicle. We review the district court's evidentiary ruling for an abuse of discretion. *United States v. Gorman,* 312 F.3d 1159, 1162 (10th Cir.2002).

■ According to Nichols, the testimony about the Wyoming stop should have been excluded under Rule 404(b), which directs that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). Rule 404(b), however, "only applies to evidence of acts extrinsic to the crime charged." *United States v. Green,* 175 F.3d 822, 831 (10th Cir.1999) (internal quotation marks omitted). "Other act evidence is intrinsic," and thus not excludable under Rule 404(b), "when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *United States v. Lambert,* 995 F.2d 1006, 1007 (10th Cir.1993) (internal quotation

marks omitted). Where the defendant has been charged with conspiracy, evidence of acts committed in furtherance of the conspiracy is considered intrinsic evidence. *Green,* 175 F.3d at 831; *see also United States v. Garcia Abrego,* 141 F.3d 142, 175 (5th Cir.1998) ("[E]vidence of acts committed pursuant to a conspiracy and offered to prove the defendant's membership or participation in the conspiracy are not extrinsic evidence, i.e., evidence of 'other' acts, for purposes of Rule 404(b)." (internal quotation marks omitted)); 22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5239, at 450 (1978).

■ Here, the district court properly concluded the evidence regarding the Wyoming stop was direct evidence of the conspiracy charged. At the motion in limine hearing, the government characterized the Wyoming stop as "the first overt act in furtherance of the conspiracy." Tr. of Mots. in Limine Hr'g at 26, Supp. R. Vol. 1. As the government pointed out, the superseding indictment specified a time period for the conspiracy "beginning some time before the 12th day of October, 1999," the date of the Wyoming stop. Superseding Indictment, R. Vol. 2, tab 81. Rule 404(b) is thus inapplicable.[5] Further, the evidence was properly admitted under Rule 402 (requiring relevance) and Rule 403 (requiring probative value not be substantially outweighed by danger of unfair prejudice). The evidence was probative of Nichols' involvement in a conspiracy. The nearly $13,000 cash, the marijuana, the hidden compartments in Nichols' car,

---

5. We reject as meritless Nichols' argument that, because the conspiracy charge was for "distribut[ion of] in excess of one (1) kilogram of heroin," Superseding Indictment, R. Vol. 2, tab 81, it had to refer specifically to the 2002 Kansas stop—the only stop where such a quantity of heroin was found. A charge alleg-

ing a violation of 21 U.S.C. § 846 may take account of the aggregate quantity of drugs involved over the entire course of the conspiracy. *Poindexter v. Nash,* 333 F.3d 372, 380 (2d Cir.2003), *cert. denied,* 72 U.S.L.W. 3538 (U.S. Feb. 23, 2004) (No. 03–8487).

Nichols' false identification, and the location of the stop on the I–80/I–70 route together supported the inference that he was traveling from St. Louis to Sacramento to buy heroin from some associate there in order to bring it back to St. Louis to distribute. Though the evidence was prejudicial, it was not unfairly so. We conclude the district court did not abuse its discretion by admitting this evidence.

### C. Admission of Threatening Statement to Agent Cazenavette

■ Nichols similarly argues Agent Cazenavette's testimony about Nichols' threatening statement should have been excluded under Rule 404(b).[6] Again, we review the district court's ruling for an abuse of discretion.

Agent Cazenavette's testimony was as follows:

> He looked toward me and he said, "You reap what you sow." And I just kind of looked at him and said, "Excuse me?" And he said, "Next time you come down on somebody like that they may have a present for you, something that will go through that," and that meaning my vest. I was wearing a ballistic vest that had "Police" on front of it. And I said, you know, "Are you threatening me?" And he said, "No, I'm no trigger man," he said, "but someone may have a present for you next time you come down on somebody."

Tr. of Jury Trial at 235, R. Vol. 5.

Here, the government agrees that Rule 404(b) applies. *See United States v. Esparsen,* 930 F.2d 1461, 1475 (10th Cir. 1991). It asserts, however, that a defendant's threat against a potential witness is generally admissible under Rule 404(b) for the purpose of showing consciousness of guilt. Though this is a correct statement of the law, the government fails to acknowledge the fact that here the threat was made to an arresting officer at the time of arrest, not to a potential witness.[7] The cases holding threats against a witness admissible reason that such threats show the defendant's intent to prevent the witness from testifying, and are thus an implicit acknowledgment of the defendant's guilt. *See, e.g., United States v. Copeland,* 321 F.3d 582, 597 (6th Cir.2003) ("[T]hreats against a witness constitute an effort by the defendant to tamper with the substance of the government's case, and thus are probative of a defendant's awareness that the government is likely to prevail at trial."); *United States v. Young,* 248 F.3d 260, 272 (4th Cir.2001) (similar). We cannot view Nichols' statement to Agent Cazenavette as indicating a similar intent. *See Copeland,* 321 F.3d at 598 (concluding that "threats against a prosecutor do not imply a defendant's intention to destroy evidence").

Nichols' statement may nevertheless be admissible under Rule 404(b) for one of the listed permissible purposes, such as motive, intent, or knowledge. *See Esparsen,* 930 F.2d at 1476 n. 16. We decline to pursue this question, however, because we conclude that even if the district court's admission of Cazenavette's testimony was an abuse of discretion, the error was harmless because there was other substantial evidence of Nichols' guilt. *See id.* at 1476.

We therefore affirm the district court's ruling on this issue.

---

**6.** We note that Nichols' argument on this point in his brief incorrectly suggested the statements in question were made at the time of his 1999 arrest.

**7.** Though Cazenavette did testify at Nichols' trial, he did so only in order to recount Nichols' threatening statement.

## D. Sufficiency of the Evidence Supporting Nichols' Conspiracy Conviction

We turn to Nichols' final argument, that his conspiracy conviction should be overturned due to the insufficiency of evidence presented at trial. In order to address this claim, we must review the record de novo to determine whether "viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *United States v. Delgado–Uribe*, 363 F.3d 1077, 1081 (10th Cir.2004) (internal quotation marks omitted). In performing this inquiry, "we do not weigh conflicting evidence nor consider the credibility of witnesses." *Id.* Rather, we "simply determine 'whether [the] evidence, if believed, would establish each element of the crime.'" *Id.* (quoting *United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir.2001)).

The elements that must be established to support a conspiracy conviction are: "(1) that two or more persons agreed to violate the law, (2) that the Defendant knew at least the essential objectives of the conspiracy, (3) that the Defendant knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent." *United States v. Ramirez*, 348 F.3d 1175, 1181 (10th Cir. 2003) (internal quotation marks omitted).

 Here, Nichols essentially argues that there was simply no concrete evidence supporting his conspiracy conviction; rather, "[t]he government asked the jury to pile inference upon inference." Appellant's Br. at 20. He specifically argues that there was no evidence indicating the three trips resulting in traffic stops "were related and part of the same scheme," and no evidence Nichols made any express or tacit agreement with anyone else to distribute drugs or that anyone else was involved in such an enterprise. *Id.* at 21–22.

We have explained that "the secrecy inherent in the nature of a conspiracy often requires that elements of the crime be established by circumstantial evidence." *United States v. Lampley*, 127 F.3d 1231, 1243 (10th Cir.1997) (internal quotation marks omitted). However, "we may not uphold a conviction obtained by piling inference upon inference," *United States v. Anderson*, 189 F.3d 1201, 1205 (10th Cir. 1999) (internal quotation marks omitted), unless "each link in the chain of inferences [is] sufficiently strong to avoid a lapse into speculation," *United States v. Jones*, 371 F.3d 363, 2004 WL 1257621, at *3 (7th Cir. Jun.9, 2004) (internal quotation marks omitted).

Having carefully reviewed the trial record in this case, we believe there is sufficient evidence to support Nichols' conspiracy conviction. Regarding the first element of conspiracy—that there be an agreement—"[i]t is permissible for the jury to infer an agreement constituting a conspiracy from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir.1997) (internal quotation marks omitted). Moreover, as we explain further below, such an inference with respect to one defendant is not necessarily precluded even where, as occurred here, both his codefendants are acquitted of the conspiracy charge. The inference remains permissible where (1) the indictment indicates the conspiracy involved unknown or unnamed persons and there is sufficient evidence the convicted defendant had an agreement with such a person, or (2) there is sufficient evidence the convicted defendant had an agreement

with a codefendant, the codefendant's acquittal notwithstanding.

First, we have previously held that, if the indictment specifically refers to unknown or unnamed coconspirators, the agreement element is satisfied where "there is sufficient evidence from which the jury could have concluded that an unknown or unnamed coconspirator existed and that [the] defendant and the unknown or unnamed coconspirator agreed to violate the drug laws." *United States v. Howard*, 966 F.2d 1362, 1364 (10th Cir. 1992); *accord United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 476 (10th Cir. 1990); *see also United States v. Anderson*, 76 F.3d 685, 688 (6th Cir.1996); *United States v. Rodriguez*, 983 F.2d 455, 459 (2d Cir.1993); *United States v. Klein*, 560 F.2d 1236, 1242 (5th Cir.1977). In *Howard*, we held there was sufficient evidence from which to infer an agreement where an unknown person, using a fictitious return address, had shipped a "huge quantity of crack cocaine" from California to an apparently innocent third party known to the defendant, suggesting the shipper trusted the defendant to recover the drugs from the third party, and there was "substantial evidence that [the] defendant was not a person of great financial worth and that the crack cocaine in the package represented a significant amount of money." 966 F.2d at 1365.

Here, as in *Howard*, the indictment explicitly referred to the involvement in the charged conspiracy of "other persons whose identities are both known and unknown to the grand jury." Superseding Indictment at 2, R. Vol. 2, tab 81. In this case, however, there is little evidence in the record permitting an inference of an agreement with an unknown person. To be sure, the jury could certainly have inferred from the evidence presented at trial that Nichols traveled to Sacramento to buy heroin from one or more persons there. However, "[t]he mere existence of a buyer-seller relationship between defendant and [someone else], without more, is not sufficient to convict on a charge of conspiracy to violate the drug laws." *Id.* at 1364; *see also United States v. Rivera*, 273 F.3d 751, 755 (7th Cir.2001); *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir.1999). Based on the record before us, any inference that Nichols' Sacramento supplier had any knowledge of or involvement with Nichols' scheme to transport heroin to St. Louis for distribution would be mere speculation. Indeed, we cannot infer with any certainty that Nichols had one steady supplier rather than making isolated purchases from a number of unrelated individuals. Although the record does indicate Nichols had relatives in Sacramento, no evidence was presented indicating any of these relatives, including his aunt McCauley, were involved in drug trafficking. No evidence was presented regarding how frequently Nichols visited Sacramento, and we know of only one occasion, prior to the Kansas traffic stop, that he was actually there.

As in *Howard*, the quantity of heroin found in the Kansas stop was large, and the government did point out in closing argument that the amount of cash found in Nichols' possession during the Wyoming and St. Louis stops was relatively small, suggesting Nichols was "not a million dollar heroin guy. He's a couple ounces of heroin guy." Tr. of Jury Trial at 93, R. Vol. 7. If the value of the heroin, or the extent of Nichols' financial assets, had actually been established at trial, a jury might reasonably have inferred that someone in Sacramento must have fronted the heroin to Nichols, which could reasonably lead to the further inference of an agreement between Nichols and this Sacramento associate. However, the government failed to establish these basic facts, making any inferences a matter of pure specula-

tion.[8] Thus, we conclude no jury could have found beyond a reasonable doubt that Nichols had an agreement regarding heroin distribution with some unknown person.

We thus turn to the question of whether there was sufficient evidence to infer an agreement with Mitchell, Nichols' codefendant who was acquitted on the conspiracy

**8.** The prosecutor stated, in his opening and closing arguments, that the heroin was worth half a million dollars, but this claim was unsupported by any testimony during the trial. Early in the direct examination of Trooper Weigel, he asked the officer for his expert opinion regarding the street value of the seized heroin. At that point, however, codefendant Mitchell's attorney objected based on a lack of foundation. The prosecutor then began laying additional foundation but ultimately never returned to the question of the heroin's value.

**9.** We thus for the first time expressly acknowledge that our prior ruling to the contrary in *Romontio v. United States*, 400 F.2d 618, 619 (10th Cir.1968) (requiring reversal of appellant's conspiracy conviction based on acquittal of all other alleged coconspirators), is no longer good law in light of the Supreme Court's decision in *Powell*. *Powell* specifically held that a defendant's acquittal on conspiracy charges did not require reversal of the same defendant's conviction for using a telephone to facilitate the conspiracy, 469 U.S. at 69, 105 S.Ct. 471, and thus did not directly overrule *Romontio*. However, we believe *Powell's* general reasoning in regard to inconsistent jury verdicts, which formed the basis for its holding, must equally apply to inconsistent conspiracy verdicts for different codefendants in the same trial. Other circuits considering this issue have unanimously reached the same conclusion. *See United States v. Patterson*, 348 F.3d 218, 225 (7th Cir.2003) ("[T]he reasoning of *Powell* ... applies with equal force to cases where inconsistent verdicts are rendered against co-defendants on conspiracy charges."); *United States v. Zuniga–Salinas*, 952 F.2d 876, 878 and n. 3 (5th Cir.1992) (en banc) (holding inconsistent verdicts, where the only other named coconspirator was acquitted and no evidence was presented of "involvement by 'persons un-

charge. Mitchell's acquittal does not preclude this examination since, as the Supreme Court has recognized, a jury acquittal may simply be the result of the jury's "mistake, compromise, or lenity," rather than a conclusion that the codefendants are not guilty beyond a reasonable doubt. *United States v. Powell*, 469 U.S. 57, 64, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).[9] Thus, "[s]ufficiency-of-the-evidence review

known,' " did not require reversal of appellant's conspiracy conviction); *United States v. Vogt*, 910 F.2d 1184, 1203 (4th Cir.1990) ("[E]ven where all but one of the charged coconspirators are acquitted, the verdict against the one may nevertheless stand."); *United States v. Bucuvalas*, 909 F.2d 593, 597 (1st Cir.1990) ("[T]he 'rule of consistency' ... is no longer viable in light of *Powell*."); *United States v. Garcia*, 882 F.2d 699, 704 (2d Cir. 1989) (noting "the Supreme Court has spoken decisively" regarding inconsistent jury verdicts); *United States v. Andrews*, 850 F.2d 1557, 1561 (11th Cir.1988) (en banc) ("Consistent verdicts are unrequired in joint trials for conspiracy: where all but one of the charged conspirators are acquitted, the verdict against the one can stand."); *United States v. Valles–Valencia*, 823 F.2d 381, 382 (9th Cir.1987) ("[T]he acquittal of all conspirators but one does not necessarily indicate that the jury found no agreement to act.").

A previous panel of this court suggested in dicta that *Powell* did not "expressly overturn the traditionally recognized exception" in *Romontio*, citing in support *Hartzel v. United States*, 322 U.S. 680, 682 n. 3, 64 S.Ct. 1233, 88 L.Ed. 1534 (1944). *Suntar Roofing*, 897 F.2d at 475. In *Hartzel*, however, the codefendants had not been acquitted by a jury; rather, their convictions had been set aside by the judge, thus representing a judicial determination that the evidence in support of conviction was insufficient. 322 U.S. at 682 n. 3, 64 S.Ct. 1233. We believe *Powell* governs when a jury acquittal is involved. *See United States v. Hill*, 971 F.2d 1461, 1469 (10th Cir. 1992) ("To reverse convictions merely because the jury's verdict on separate counts cannot be rationally reconciled would eviscerate the rule set forth in *Powell* because inconsistent verdicts, by their very nature, are irrational if we assume, as we must, that the jury followed the court's instructions.").

.... should be independent of the jury's determination that the evidence on another count was insufficient." *Id.* at 67, 105 S.Ct. 471.

We believe a jury could reasonably have inferred an agreement existed between Nichols and Mitchell. The evidence showed Nichols and Mitchell had known each other for nearly two years, at least. Mitchell was present in the Land Rover at the time of the St. Louis stop, where marijuana was found in the vehicle, and gave a false name to police at that time. Since Mitchell was from Sacramento, and the confidential informant had reported that the Land Rover was on its way to California, a jury could reasonably infer Nichols and Mitchell planned to travel to Sacramento together on that occasion. At the time of the Kansas stop, nearly two years later, Nichols and Mitchell were again traveling together, this time from Sacramento on the way to St. Louis. Both trips appeared to involve purchasing or transporting heroin for distribution. We believe this evidence, together with the reasonable inferences therefrom, is sufficient to "indicat[e] concert of action for the accomplishment of a common purpose." *Carter,* 130 F.3d at 1439 (internal quotation marks omitted). Moreover, this was also sufficient evidence to establish interdependence. *See id.* at 1440 ("Interdependence exists where each coconspirator's activities constitute essential and integral steps toward the realization of a common, illicit goal.").

The conspiracy's existence having been established, the record leaves little doubt that Nichols knew the objectives of the conspiracy and was a knowing and voluntary participant, thus satisfying the second and third elements of a conspiracy conviction.

We therefore hold Nichols' conviction was supported by sufficient evidence.

## CONCLUSION

For the foregoing reasons, Nichols' conviction is AFFIRMED.